Roberts, Jr.: We'll hear argument next in Case 16-499, Jesner v. Arab Bank. Mr. Fisher. Fisher, Jr.: Mr. Chief Justice, and may it please the Court, this Court made clear in Keovil that the ATS should be construed first and foremost according to the ordinary rules of statutory construction. And applying those tools here yields a straightforward result. The traditional presumption that corporations can be held liable in civil actions for torts controls here. Now, the Bank's principal response is to say that the ATS sometimes can create foreign relations issues when cases are brought against corporations. But for two reasons, that objection does not overcome the strong presumption of tort liability here. First, some ATS cases do not involve foreign relations at all. Take piracy, for example. So the foreign relations argument cannot justify the categorical rule the Second Circuit has laid down in this area. And indeed, a categorical bar against corporate liability would itself create foreign relations problems along the lines the ATS was designed to put to solve. And second, even when there are foreign relations issues, and perhaps this is an even more important point, there are many other doctrines readily available to courts to directly and effectively deal with those issues. There's no need to use the mismatch theory of no corporate liability when you have tools available under the common law to address the arguments when they arise. Take the extraterritoriality holding of Kiobel, first and foremost. As the Court stressed in that case, the theory of the extraterritoriality presumption, anti-extraterritoriality presumption, is to keep the U.S. out of foreign relations friction by applying its law overly aggressively to incidents elsewhere in the world. Now, after Kiobel, I would suggest that that extraterritoriality holding has had its intended effect. There are many statistics cited on the other side about the number of ATS suits that have been brought over the past couple of decades. But the relevant question for this Court is, what does the landscape look like now in the post-Kiobel world? And the Chamber of Commerce has actually done a study on this, and that study noted that at the time of Kiobel there were 40 cases pending against corporations. In the two years after Kiobel, over 70 percent of those cases were dismissed on extraterritoriality grounds, and another 10 percent were dismissed for other reasons. So what you have are. Sotomayor, would Dambler apply here? Dambler, our personal jurisdiction case about corporations? Yes, we think that. I only sue them at their corporate headquarters or principal place of business. Will that take care of most of the next 30 percent? Well, that would take care of general jurisdiction claims. Of course, here we have a specific jurisdiction claim, and the bank, because of its presence in New York, has never even made a personal jurisdiction argument. But, yes, Justice Sotomayor, that would be another tool available to district courts. And so now what you have is a very, very small universe of cases, a manageable universe of cases, one that makes the U.S. position in this respect very much like other courts in the world, particularly our close allies in Europe and otherwise in North America, as a comparative law scholar's brief points out. And there's no reason whatsoever to have this corporate liability bar that has no basis in the text. Roberts, I'm sorry. Where else in the world would this type of action be brought against the corporation or almost really against anyone? I'm concerned about the foreign entanglement issue. I mean, we passed this statute to avoid foreign entanglements, because we wanted to provide a forum for someone like the French ambassador in the Longchamp affair. But I'm wondering if extending it to corporate liability is, in fact, going to have the same problematic result of increasing our entanglements as it obviously has here with respect to the government of Jordan. Well, I think you asked, the first question is where else could lawsuits like this be brought. At pages 43 and 44 of our blue brief, and at pages 15 through, I believe it's about 19 of the comparative law scholar's brief, there's a survey of other jurisdictions in the world. I'm not talking about jurisdictions that allow suit against corporate defendants. I'm talking about a case like this one, foreign activity, foreign defendant brought in a jurisdiction against a corporation seeking monetary relief like that. My understanding is that the availability of this sort of relief is pretty unique here. Yes and no, Mr. Chief Justice. I want to be clear, the more refined question you just asked me was the one I was answering. So those examples I gave you are examples like this with corporate defendants for international law violations conducted in other parts of the world besides the forum being brought. So those cases are brought. Roberts. Sotomayor. It's foreign, foreign corporate defendants? Sometimes yes, sometimes no. But here, you know, of course, again, disconnecting back to Justice Sotomayor's point, here we have. Sotomayor. I'm sorry, what Mekai brief was that you mentioned? Sorry to cut you off. The comparative law scholar's brief. This is a case where Arab Bank itself had a branch in the United States, and so it's sort of in between a totally foreign defendant and something inside the country. But to turn back to your point about the ATS being unique, the answer to that is yes and no. It's unique in the sense of the way U.S. law effectuates this availability of relief for international law violations. It's not unique in the fact that that availability exists. So what you have in other parts of the world is you have just regular tort claims that can be brought. Or in the Netherlands, you can bring a claim directly under a treaty. In other countries in Europe, you can bring an attendant civil claim attached to criminal prosecutions for violations of the law of nations. And it brings me back to what is unusual about the ATS, and it ties into our history with the first Congress. Remember, this brings, again, back to the purpose of the ATS. Congress did not want these cases to be brought in State court. They didn't want, more precisely, they didn't want to leave it up to the States as to whether to allow these claims in the first place. And so it's a feature of our unique federalism that we have this statute in a statutory way that allows these claims to be brought. Well, if we look at that purpose, when we are dealing with what I'll call step two of SOSA, so the question of whether we should recognize a Federal common law claim under particular circumstances, should we, in effect, balance the international repercussions of deciding the issue one way or the other? So if we hold that corporations can be sued under the Alien Tort Statute, we have a fair idea that there are going to be cases like this one and like Kiobel that do raise foreign relations concerns. Now, there are some that you can hypothesize on the other side, but are they at all comparable? Fisherman, We're denying a forum in the United States for a case against a corporation that will have equally serious foreign policy consequences. Fisherman, Well, let me start by agreeing with you that, yes, as a matter of your step two SOSA authority, you can and should look in part to international implications of having a cause of action like this. But my first answer to your question is that, insofar as you have those concerns, you should deal with it with other doctrines, like extraterritoriality, like forum nonconvenience, political question, other kinds of doctrines more directly deal with those concerns. Ginsburg, Which would apply the same as an individual or a corporation. I thought SOSA was saying international law starts out being a law governing relations between states. But now it has gone beyond that, and there can be private actors who are governed by the law of nations, international law. So what I don't comprehend is why you would split individual and corporation. I read that footnote as saying one thing is you can't sue any private person, and then the other, you have to consider whether private persons would be included, individuals, or corporation. Fisherman, I agree with everything you just said, Justice Ginsburg. SOSA holds that you do not look to international or you do look to international law for defining the norm under which the cause of action is proceeding. But I think Justice Alito is also right that once you have gotten past that, which is not in front of the Court here, as a matter of the common lawmaking authority to manage the civil action that is the cause of action under the ATS, one of the touchstones could be international law. But if I could return to Justice Alito's question. So first of all, there is a mismatch between their theory and the solution. There are other doctrines more available. And just imagine other situations. Remember, their theory would be exactly the same if it were a U.S. corporation that was a defendant in this case, and indeed if the terror attacks had occurred in the U.S. You are talking about very serious foreign policy implications at that point. Take also, as I said, piracy, slave trading, child labor practices that might occur in this country. You have to ask yourself. Alito, if it's a U.S. corporation, won't there be other grounds on which the suit can be brought? Fisherman, well, it brings us back to the purpose of the ATS. If it's a foreign plaintiff, what Congress wanted was to have that case brought into Federal court. If it's a law of nations theory, there is the violation. Alito, you have a foreign plaintiff suing an American corporation. That could be brought in Federal court, could it not? It could be brought in Federal court, but the law of nations theory that we are proceeding under is available only under the ATS. Some of those cases might be. I'm sorry. No, I'm sorry. Let's go back to 1789 and think of concrete examples. So we know the example of the French, a French citizen assaults a French diplomat in Philadelphia. There could be foreign policy repercussions for the United States if the Federal courts didn't provide a forum for that suit. That's said to be the thinking behind the ATS. So suppose the French diplomat is assaulted by a British subject on a ship coming to the United States but still in international waters at the time of the assault. Now, would the First Congress have wanted that to be heard in Federal court where you have to put us in exactly the situation between these two superpowers that we wanted to avoid? Well, I think, Justice Alito, the answer to that question would be an application of the extraterritoriality doctrine. It would not be an application of a no corporate liability rule. Just to return to 1789, imagine the process server, which was one of the other examples that gave rise to the Act, working for a corporation. And as the United States points out in its brief, it would make no sense to have to think Congress would have thought the corporation for which the process server was working shouldn't be subject to suit. And I know you talked at the first Keeble argument about the example of piracy. And unfortunately today, that's an example that is important not just then, but today. And piracy operations can be in a corporate form. Mr. Fischer, looking back to 1789, as Sosa indicates, we should, beyond extraterritoriality, did it also anticipate that there is an American defendant in the case? Professor Beaulieu and Clark argue that that's exactly what was in mind, was some action by an American citizen that might be tagged to the United States itself and be caused for just war by a foreign power, and that that was the purpose of the ATS. So what do you say about that? And then relatedly, if international law was not part of the Federal law itself in 1789, and I think there's an argument that that's what the Congress understood too, then don't you need an American defendant in order to have diversity jurisdiction? So to take your first question, remember the de Longchamp's example involved two Frenchmen. So that's, I think, a direct representation. Well, you've got the ambassador provision as well, which is a separate part of the Constitution, and the ATS was arguably meant to do more than cover ambassadors. Well, I think that it just shows you that a foreign defendant could be a problem. Well, but I think we have a separate statute in 1789 to deal with that issue too. So that doesn't answer my question. Well, I think that there have been many, many examples. Another example, the Attorney General's example of the irrigation company that in 1907 that he said could be subject to the ATS. Nobody thought that was incorrect, and there have been numerable other cases with foreign defendants and foreign plaintiffs. And as long as it touches and concerns this country, and this is the holding of Kiobel, then we think it's a proper case. But can you answer my question about what the expectation was in 1789, so as it tells us it should govern our review? The understanding I — my understanding of Congress's understanding in 1789 was that the international law was part of U.S. law. That's the way Paquette de Havana described this situation years later. Isn't that what this Court said? I think that's right, Justice Ginsburg. And so, therefore, it would have been a proper use of Congress's powers under the Define and Punish Clause. I don't doubt that's what we've — some have suggested since then, but do we know that was the understanding of the Congress in 1789? It seems like Professor B'Leah Clark, others have argued, Goldsmith has suggested maybe otherwise. I think there have been a robust — I'm sorry, a robust set of arguments made about the history of the ATS and how it should be interpreted. Justice Gorsuch, I think those were hashed out in SOSA, and so I think that that position in SOSA didn't carry the day. And what carried the day in SOSA was the notion that international law was received into this country as part of the Federal common law, and, therefore, when the ATS says that causes of action can be brought for violations of the law of nations — If that's the case, then you've got Federal question jurisdiction, and what's the point of the ATS? You have — the point of the ATS is to direct it to a Federal forum and to make clear that alien plaintiffs can bring these cases, and to make it absolutely clear as a statutory matter that the Federal courts had jurisdiction. It's part of the — as you know, part of the first Judiciary Act, the same way that — Well, the same way that Maritime law, Maritime jurisdiction is more specifically set out in the First Judiciary Act, Congress wanted to make absolutely clear, because of the history that the Court has canvassed and that we've already discussed today, that it was able to be brought in Federal. You've referred to the extraterritoriality doctrine as one that would limit the application of the ATS in cases that have foreign relations problems, but I don't know how much limitation that's going to impose if — if it is — if the presumption against extraterritoriality is satisfied whenever a foreign financial transaction is cleared through New York. Justice Alito, of course, that issue is in front of you, and nobody's — and so we're not asking you to resolve it, and neither is the United States, but I'd say two things in respect to that. If you want to think about that issue for purposes of this case, the amicus brief on our side by former financial regulators and financial regulation scholars explain that dollar clearing, as the — as the function is called, is actually a core function of finance, and it's so important that the Federal Government itself exercises jurisdiction over any bank that does it, and — and holds it liable under the Bank Secrecy Act, the Foreign Corrupt Practices Act. In this very case, or in the facts giving rise to this very case, we know the Federal Government imposed a very heavy sanction on Arab Bank for using its New York branch in the way it did. So I would — I would — I would push back a little bit. Kagan. I take your point that that's not in this case, but if it were in this case, that what you just said does raise Mr. Clement's argument that there are many better ways, perhaps, dealing with, you know, financial regulation generally than allowing private suits to deal with those sorts of issues? So, Justice Kagan, if I may say one more thing to Justice Alito, and then turn to that case where we have the money-laundering allegations using the bank — using the charitable front in Texas, and as the United States points out, that also satisfies touchy concern if that gets litigated on remand. Now, Justice Kagan, to turn to your question, we just don't think — it's just a red herring to point to all of the various banking regulations that exist in the world. We're not proceeding under any banking regulations. You know, the bank would like to tell a story to this Court about it being a negligent and innocent actor in this — in this scenario, but that's not what the factual allegations are, and it's not even what the district court has found that we proved in the ATA part of this case. What we allege is knowing and purposeful financing of terrorism with the expectation that it will make those terrorism attacks more successful and more lucrative for the perpetrators, and that is a violation of the law of nations. The Court does not need to worry that there's going to be a flood of lawsuits against banks or any other financial actors if we are allowed to go forward in this case, eventually, on our substantive claims, because you have to allege a violation of the law of nations, not of mere banking regulations. Ginsburg. What about another limitation that's been suggested, extraterritoriality? That's what this Court has declared. There's a suggestion that perhaps there should be an exhaustion requirement, that is, you sue first in the country most concerned. You sue where this happened. And then if you don't have a remedy in that most natural form, then you can come here. Are you asking me whether that's an acceptable doctrine? Yes. The exhaustion. Yes. I think in footnote 21 in Sosa, the Court suggested that that may well be a requirement for a cause of action like this. It doesn't apply in this case, Justice Ginsburg, because the bank argued in the district court only that we should have brought this case in Jordan, and we responded to that argument with many, many problems with that suggestion. The district court rejected it, and the bank did not appeal that finding. So there was no adequate forum available to us. And secondly, Justice Ginsburg, it's worth remembering that this case began as a combined cause of action for the alien plaintiffs under the ATS and for the U.S. national plaintiffs under the ATA. So it made every bit of sense for efficiency concerns to bring in a single forum with a single judge, these joint claims that deal with the same core factual allegations. Kennedy, the theory of your case is that Sosa step one, where we ask if there's a specific universal norm, is different from saying what parties are bound by that norm. But isn't it true that with respect to corporate liability, which can be strict liability, vicarious liability, respondeat superior, Monel, that this does impose a norm in the sense that it tells corporations what they must do, how they must run their business. That seems to me a norm. No, I think, Justice Kennedy, it's not in the Sosa sense, because the U.S. rule here is respondeat superior, and that's the rule shared by the vast majority of civilized legal systems. And then all that rule then tells you to ask is who's responsible for the bad acts here. So it's a matter of ---- No, but norms control behavior. And we are saying that corporations, with this extensive liability under respondeat superior, now must conform their behavior. That seems to me to be a norm. Justice Kennedy, I think there are other things that might influence the way a corporation acts, limitations periods, rules of evidence that will apply in any course of action. So just the mere fact that it's going to influence corporate behavior does not make it a norm question under Step 1 of Sosa. And let me say one other thing, which I think also responds to Justice Alito's question. Another place the Court has looked to understand how to apply international law is to what the government says. In the last two administrations and the last two State departments have agreed that this is not a Sosa Step 1 question. This is a question simply of remedies that international law leaves to local jurisdictions. And we think that deserves some weight, and indeed it's correct. If I could understand what you're saying. You're saying that a norm is just a standard of conduct and doesn't have anything to do with the enforcement of that standard? That's right. Is that the basic point? Yes, Justice Kagan. So I'll reserve the rest of my time. Thank you, counsel. Mr. Fletcher. Thank you, Mr. Chief Justice, and may it please the Court. In the government's view, for some of the reasons that Justice Alito alluded to earlier, there's a serious question whether the claims in this case have a sufficient connection to the United States to proceed in U.S. Court under the Alien Tort Statute. But the Court of Appeals did not reach that important extraterritoriality question because it relied on its rule that a corporation can never be a defendant in an Alien Tort Statute case. And in our view, that categorical rule is wrong, and the Second Circuit reached the wrong result because it looked to the wrong source of law. Mr. Fletcher, could you answer the beginning question on the implications of a holding in this case in the Petitioner's favor? Why are you less worried about the international – the impact on international relations? Because your adversaries are telling us that we should be worried. They're right, and I think they're absolutely correct that ATS litigation in recent decades has raised international friction, indeed, as this case has raised international friction. But in our view, the way to deal with that friction is with a doctrine that speaks directly to the international entanglement, extraterritoriality, as this Court did in Kiobel, and as it can further do as those questions arise. But I think one way to illustrate that point is to ask whether this case would produce less international friction if it had been brought against the high-ranking officers and employees of the bank rather than against the bank itself. And I think the answer is you would still have some degree of international friction if you had suits against corporate officers and employees. And what that tells you is that the way to deal with international friction is by carefully defining, as this Court has begun to do already in Kiobel, the types of violations that are remediable. But I think once you have a remediable violation, that's really the way we view the question here, that however – Robertson, I'm sorry, please finish. I was just going to say we answer the question here by saying, once you've carefully defined those violations of the law of nations that ought to give rise to a remedy in U.S. courts, what should the scope of that remedy be? And when you view it in that lens, we don't see a sound reason to categorically exclude corporate liability. Robertson, I think this might be a question along the same lines. On page 7 of your brief, if I could just read one sentence, you say that the function of the ATS is to ensure private damages, remedies in circumstances where other nations might hold the United States accountable if it did not provide a remedy. Who's going to hold us accountable, what other nations, in this case, if we didn't provide a remedy? Well, I think there's – we don't see a reason. It seems to me the other nations are holding us accountable for providing a remedy. And that's why we say at the tail end of our brief that we have serious questions about whether or not this case belongs in U.S. court precisely because it is extraterritorial potentially. Again, we haven't expressed a definitive view on that because parts of the record are sealed. But we understand the principal connection to the U.S. to be the clearing of dollar denominator transactions through New York. And we've taken the view that that's not sufficient to displace the presumption against extraterritoriality. Alito, if we remand this to the Second Circuit, and the Second Circuit holds as it may very well in light of its precedents that there is no extraterritoriality problem here, then what happens? Then there has to be a trial before the issue can be brought here again? Can I say two things about that? I think the first one would be if the Second Circuit did that, there would be another opportunity for a review in this Court. And also to your point about the Second Circuit. Alito, at what point? I would think if on remand the Second Circuit issues another decision deciding the extraterritoriality issue, Mr. Clement would be back here with another cert petition asking for a review of that question once it had been decided by the Second Circuit. But I also think your point about Second Circuit precedent speaks to the case that Mr. Clement cites at the end of his brief, the Leachy decision. But the observation I make about that is that that also involved allegations about clearing transactions through New York, and the Second Circuit, a panel of it, stated that that was sufficient to overcome the presumption against extraterritoriality. I think everyone, though, agrees that that was dicta, because the case was ultimately dismissed on corporate liability grounds. And I think also it's important to remember that there's a petition for certiorari pending in that case, and if this Court were to agree with us that the corporate liability rule is wrong, on remand it would presumably vacate that decision and clear the way for the panel in this case to consider the issue of correction. If I could go back to the Chief Justice's question. So in what kind of case involving a corporate defendant would another country hold us accountable if we didn't provide a remedy? I think the classic ones are the ones that this Court suggested in Kiobel were sort of the heartland of what Congress had in mind when it enacted the statute, which was foreign officials injured in the United States. We know from the history that led up to the enactment of the statute in Marbois and the 1787 incident involving the Dutch ambassador that those sorts of violations could give rise to international friction, and that the purpose, as this Court said, was to provide an adequate remedy, a Federal forum and an adequate remedy for those individuals to avoid the possibility of friction. So what you're saying is that in those sorts of classic cases, why would the foreign government care that the perpetrator was a corporation rather than an individual? And if anything, I think it cuts the other way, because I think because, as we point out, tort remedies always, in virtually all circumstances, include the possibility of recovering from the corporate employer when a corporation commits the tort. We think actually there's the possibility of friction or at least defeating the purpose of providing an adequate remedy if you say in this class of tort cases you do not get that normal tort remedy. We think, in fact, it would be very odd to say that when the whole point of the statute, at least as we understand it and as the Court has understood it, is to provide an additional forum. And counsel, might that be because it's a an American defendant against whom the United States might be chargeable for a just war? Wasn't — what do you say to that scholarship that suggests that that's the key to the idea of what causes friction in alien versus alien causes of action aren't within the statute? I think that I give, at least as a first line, the same answer that Mr. Fisher did, which is that that's a little tough to reconcile with the Marbois incident, which involved a tort by an alien, which certainly did give rise — it was a notorious incident. It gave rise to quite a lot of interaction. You've got the ambassador clause there that's separate and that they had a separate statute to deal with that exact problem in 1789. And this was to deal with something else, an additional, beyond the ambassadorial problem. Well, I'm not sure the Court has suggested that actually — You've got Professor Blea, Professor Clark, a whole bunch of really interesting scholarship on this point. I'm just wondering what the government's point of view is on it. I think the government's point of view is that that is not the understanding of the statute that we understand this Court to have taken in Sosa or Kiobel, in part because in both of those cases you had aliens on both sides. That was also true in the Marbois incident. It wasn't addressed, though, and I don't think it's been foreclosed necessarily either. I mean, it's certainly true. We took the view that courts in America can't apply general international law, sure. But I'm not sure it's addressed this specific theory of the ATS. Well, there's sort of two different theories that are alluded to in the scholarship that you're referring to. I agree with you that Sosa didn't consider this specific argument, that it's only alien or U.S. defendants. That wasn't addressed. Sosa did, though, address what I think is the other strand, which is what is the If it didn't address that one, what do you say to it? Well, I say to it, I think, where I started, which is under that theory, the ATS would not have provided a remedy for the Marbois incident or for another similar incident. And I take your point. But there's another statute that does. So what? Well, I think this Court has certainly understand the Marbois incident as a key to interpreting what Congress was trying to accomplish in the alien tort statute. I think it illustrates even if that particular assault on ambassadors might have been remediable under another statute, it illustrates the point that foreign nations didn't observe the limitation that Your Honor is suggesting. They didn't only hold us accountable when bad things were done to their nationals or their officials by U.S. citizens. But it might explain why this statute exists in addition to that other one. Well, I guess the other one involves all, I think, I don't remember exactly how the Judiciary Act of 1789 was worded, but certainly there is some jurisdiction over all causes involving ambassadors. I don't think that the Congress would have been worried about an alien defendant if it had been a pirate. I think that if an American ship was pirated, I don't think they would have not thought that the ATS was only available for suits against U.S. citizens. I think that's another fair response. And I think Mr. Fletcher, unless you're No, please. Just a different kind of question, which is you're here saying there shouldn't be an automatic bar against corporate liability. That's right. But I wonder if you have any view, and if not, just say no, as to what the scope of corporate liability might be. In other words, some folks have said, well, in this context, corporate liability might be only available for actions that were directed at high levels of the corporation, as opposed to anything that any old employee of a corporation did. And I'm wondering whether you've thought through that question. We haven't taken a view on it. I think the most prominent advocate of that view that I'm aware of is Judge Posner's opinion for the Seventh Circuit in Flomo, where he made that suggestion. The one thing I would say about that, actually, is that I understand his opinion to be suggesting that that more limited version of corporate liability would be appropriate in large part because he assumed that this statute applied extraterritorially, and he was concerned about holding the corporation liable for something that happened in some far-flung office, and wanted to make sure that there was appropriately high-level accountability before imposing liability. And obviously, this Court's decision in Keobel cuts back on that concern because it makes clear that the claims have to actually touch and concern the United States, and so it might alter the analysis there. Roberts. Did he cite legal authority for that proposition? I think he – I can't remember whether he cited it or not. I know the Court has also limited the scope of respondeat superior or under Section 1983 in the Monell decision. So there are circumstances where corporate liability has been limited, but certainly I think for present purposes, all we're asking the Court to do and all the Court needs to do is say there is no categorical bar on corporate liability. And if I could, just before my time runs out, I do want to turn to what is the government's other important interest in this case, which is that if the Court agrees with us that the corporate liability bar is incorrect and sends the case back down for further proceedings, we think we'd urge the Court to indicate in its opinion that the Second Circuit ought to address what we regard as a very serious extraterritoriality issue promptly on remand, because this case has been a source of international friction, and because if that important issue isn't resolved quickly, there may be more international friction from a trial. Thank you. Roberts. Thank you, counsel. Mr. Clement. Mr. Chief Justice, and may it please the Court. This case arises out of a suit by Israeli nationals against a corporation chartered in Jordan for injuries suffered in Israel and the adjoining territories. The defendant is not just chartered by the Kingdom of Jordan, but it's closely regulated by Jordan and its central bank. Now, there are a host of problems with this lawsuit, not the least of which is there is nothing approaching a specific, universal, obligatory norm under international law that imposes obligations directly on corporations. And try as they might, the other side really can't deny that basic reality. Sotomayor, there's no international norm that makes people civilly liable for international torts. There's never been an international court that has held an individual responsible. The norm is the conduct, i.e., should you be financing terrorists or not? Should you commit piracy or not? Should you commit slavery, genocide, any of the other prohibited international acts against humanity? So if there's no civil liability, international civil liability for an individual, was the ATS a violation of that norm, of the norm you're trying to create that doesn't exist? No, but, Justice Sotomayor, I think it's critical that in your various formulations, international law does speak to who is the you, who is the actor that can violate international law. Sotomayor, you or you, the State, or you as an individual, but an individual that's not. Or you, the artificial juridical entity. And there is a body of international law that speaks specifically to that, both in the criminal context and the civil liability context. And in neither context is there anything approaching a universal obligatory norm. When you said that, I've assumed, shall I take as a given, the statement in SOSA, does international law extend the scope of liability for a violation of a given norm to the perpetrator being sued if the defendant is a private actor, such as a corporation or individual? That's the question you're addressing. Then I've assumed, as it was brought out, that in fact, if a private person struck the French ambassador in the street as a matter to disgrace him, knocked away his badge, that this statute was passed to give the French ambassador a cause of action against that private person. So we know that sometimes the norm, even though it addresses what the State is supposed to do directly, is also telling the private actor not to do it. It's close enough. Now, when you look at this case, what they've cited is, for example, the International Convention for the Suppression of the Financing of Terrorism, which we've ratified, which says that States must take necessary measures to enable a legal entity located in its territory or organized under its laws to be held liable. That sounds like a corporation, and it sounds like the relation is the same as the international norm to the individual who struck the French ambassador in the street. And then, similarly, the U.N. Security Council has required States to prohibit persons and entities within their territory from financing terrorism. Then we've implemented those through the Anti-Terrorism Act, and there are other States that have incorporated it, and there are other examples. So when you say there is no such example, it seemed to me that the briefs are full of examples that are designed to make the point that the relationship between the corporation and the international norm is the same as the relationship between the private individual who struck the French ambassador and the international law at that time. Now, what is your response? Well, I have multiple responses, Your Honor, Justice Breyer, starting with the concern in 1789 was that some individual might strike the French ambassador. There wasn't a concern that some artificial juridical entity would rise up and strike the ambassador, and then the question would arise. Well, really, but why would it have mattered? Suppose that there was a corporation that had a beef about the ambassador and sent one of its employees to go strike the ambassador and sent a judgment-proof employee to go strike the ambassador. Why would France have cared? Well, I think France would care that there would be some individual, probably the actual tortfeasor, which in that case would be the individual, who could be held responsible, and of course, Congress had a provision for the judgment-proof tortfeasor, which they also, in the Crimes Act of 1790, made it a criminal act. And I think it's important to recognize that this Court's person, this Court's case, which I tend to think is precedent, says person or entity. And the norms that I read to you say person or entity. And if it were an American corporation, I can't imagine why, if it fell within the international norm, you would free it of liability. So how does it answer the question I raised to say corporations are never liable, given that precedent? With respect, Justice Breyer, I don't think under SOSA my burden is to show that they're never liable. My burden – the burden is on the other side to show a specific obligatory universal norm of corporate liability. Exactly right. I completely agree.  Now, given that, what are we going to do about it? I just want to be sure I get any of the second part. And what I would tell you is there is nothing approaching that. And I would start with, though I would like to, if I could, go through the criminal provisions and the civil liability efforts under other treaties. But I'd start with the financing convention. And I would tell you it's very important to read Article II and Article V in contradistinction with each other. And you will see that they are very different. Section 2, Article II, makes it unlawful, as a matter of international law, imposes a duty on a person. It doesn't define person, but then if you look at Article V, it's crystal clear that the persons in Article II do not include legal entities that are addressed separately in Article V. And Article V is different. It doesn't impose any direct international law obligation on the legal entity. It tells the country's – Ginsburg. But you are asserting that international law doesn't operate against corporations, but neither does it operate against individuals. It's the national law that supplies the remedy. I disagree, Justice Ginsburg. I think there's a tremendous difference between how international law operates on natural persons and how it operates on legal entities. And it's true. Ginsburg. Can you give any – is there any place in the world that draws the distinction between individuals and corporations as far as liability for violation of the law of nations? Sure. One place I could start with is the Torture Victim Protection Act, which is the only statute this country has ever passed specifically with the idea that it would enforce under 1350. That's thinking of a torturer like the Fanatica case. Absolutely it is. But that's an example of where the – this nation – But, I mean, you said that international law doesn't recognize corporate liability. And so not the United States. A specific statute, Congress can make it individual, corporation, whatever it likes. But in – elsewhere in the world, is there a distinction made between individuals and corporations when the international norm applies to private persons? Yes, absolutely. And, I mean, you know, you can start with Nuremberg, and then you could go to all the international criminal tribunals that have been set up, whether for Yugoslavia, Rwanda, or the Rome statute. All of them have made a judgment that individuals – Mr. Clement, there were scholars here who pointed out that criminal law is different than civil, and the brief that was cited by Mr. Fisher points out that there are many, many nations that hold individuals and corporations civilly liable for violations of the international norms. So where do we find international norms, if not in the behavior of international companies, of international countries? Don't they show us what the norm is? I don't think there is a norm to hold corporations liable for violations of international law, especially under jurisdictional circumstances like this, where the United States is a stranger to the dispute. But I do want to make clear, and I want to come back if I get a chance, to say why the criminal provisions are highly relevant. But it's not like international law hasn't thought about the idea of imposing civil liability directly on corporations as a matter of international law. There are six treaties that purport to do that. They're collected in footnote 40 of Judge Cabranes' opinion at 116A of the petition appendix. All six of those treaties impose corporate liability directly – civil corporate liability directly under international law. What is so telling about those six treaties is that the United States has signed exactly none of them. And so I think when you are looking under SOSA for a universal, obligatory, and specific norm, one of the first things you look to is whether this is so well established that the United States has signed some of the treaties, and the idea – I mean, six treaties that the United States hasn't signed doesn't get it done. I think the reason I said I don't agree before is because when you're talking about a standard of conduct under SOSA, it's clear that you have to find this universal body of law. But that's different from enforcement mechanisms. It's different – you know, we have the ATS. Other countries have different things. Nobody requires an ATS-like provision. Nobody – so as to enforcement, I mean, where do you get the understanding that that's a question where all countries have to agree to the same thing? As far as I understood your brief, you're only getting it from that SOSA footnote 20, which really does not make that point at all. No, but, Justice Kagan, as you yourself pointed out in the first argument in Kiyobel, if the footnote does specifically look to international law to figure out whether non-State actors are covered, it's a little odd that it wouldn't also look to international law to address the question of whether artificial juridical individuals or entities are covered by the norm. So I do think the logic of what got the Court to where it did extends here, but I have other answers, too, which is I think that it's – I agree that there should be some notions of, you know, what do other countries do and is this likely to get us into trouble with other countries or not. I mean, that should come into play at some point when we're trying to figure out what kind of claims to accept, and I think even Mr. Fisher agrees with that. I don't think we have to ask about, you know, is it a uniform norm that every country accepts, but rather we have a set of rules under our domestic system which does hold corporations accountable, and if we use that as the typical enforcement mechanism, is that going to get us into trouble with other foreign countries? Is it going to create international friction? And it seems to me that that's the level at which all these international slash foreign relations concerns come into play. See, and I would disagree with you there, and I don't want to sound sort of Chevron-esque here, but I think the question is do you look at that at step one or do you look at it at step two? And I think it's important because I think it's pretty clear, and this is presumably why you disagreed with me, but I think it's pretty clear that at step one the burden is on my friends to show that it's a universal specific obligatory norm of international law. But, see, that would suggest that all enforcement mechanisms have to be the same worldwide, and they just don't. See, I would take issue with the premise of your question that the extent of corporate liability is just an enforcement question. I don't think that's actually right. If you look at what they cite in their brief, they don't cite the restatement of remedies. They cite the restatement of agency and torts. So it's certainly substantive law. Ginsburg. How about foreign relations? What's that? And foreign relations, sure, but not remedies. It's not a remedial question. Doesn't that restatement recognize that there can be corporate liability for a violation for engaging in conduct that violates international law? I don't think that the restatement says that, certainly at the level of specificity and university or universality required by SOSA. Do you think that joint and several liability? I mean, that's also an American concept. Would that have to be accepted by every country in the world? I don't know that it would, because I think the concept of joint and several liability might get you closer to a remedial question. I do think whether or not a corporation is directly liable under international law is a question that should be answered at step one. And I think it's important to recognize that if you say corporations are liable, then you sort of have to answer the question of, well, how? And on that, it's not just Judge Posner. If you look at the financing convention, this is the other thing that's very interesting. About Article V of the financing convention, and the relevant part is on page 31 of the red brief, but it actually addresses the circumstances in which a corporation could be liable under domestic law for a terrorist finance violation, and it does not apply the American concept of respondeat superior such that the master is responsible for every act of the agent within the scope of agency. Instead, it specifies that it is only their own other countries are only supposed to impose liability when someone in a control or management position commits one of the primary violations under Article II of the convention. So that's not an American conception of corporate liability. It does show that international obligations speak to these questions. They just don't speak to them with anything like the kind of universality and specificity that I thought this Court would require. Breyer, I quite agree with you. I looked at the footnote, and you can't get very far by pointing to six treaties that we didn't or others didn't sign. But let's look at what we did sign, and what we did sign were the two I mentioned. And not only have we – three things. One, we signed those. Two, we've implemented those. We've implemented those by saying that it is unlawful for corporations to finance terrorism. And three, if you had a rule of international law that said you cannot finance terrorists, who do you think it would apply to? I mean, maybe it applies to a few billionaires, but, I mean, other than that, if it doesn't apply to corporations, who does it apply to? So, I mean, you have those three things that I think argue that in this case, this provision of international law does seem – and you want to say, no, that's wrong. Because? Because you start with the fact that the convention itself doesn't impose the international law obligation itself. It leaves it to domestic law. Now, you're right. We passed a statute that provides a remedy, the ATA. We went out of our way to limit the scope of plaintiffs under the ATA to U.S. nationals. And that helps eliminate friction with other countries, because it's an understandable norm of international law that we have a special relationship with our own nationals. So, of course, we want to provide a remedy to them when they're victims of terrorism, even if they're injured abroad. We want to do that. So all of those are reasons that I think very much cut against doing this under the ATS. And let me tell you – Are you saying that under the ATS, a U.S. corporation would be liable? I thought you were taking the position that categorically corporations are out, it's only individuals. No, I may have misspoken my acronyms. U.S. corporations are proper defendants under the ATA, the statute that was provided. The ATA remedy, though, is specifically limited to U.S. national plaintiffs. Yes. Under the ATS, we would say that no corporation is liable. Not a U.S. corporation. Not a U.S. corporation. And we would say that actually makes sense, because if there are agents of the U.S. corporation here, they will be liable and we won't be dragging in – Jordan is going to be okay being called a financier of terrorism merely because it's a U.S. citizen who brought this suit. I thought it was objecting to the fact of the label of being a terrorist financier. Does it matter to it who the plaintiff is? Well, it does matter in the sense that Jordan is even more vexed that this corporation that is a cornerstone of their economy is being called a – not just a terrorist financer under the statute, but, you know, almost – This is a consolidated suit under the ATS and the ATA. Okay, but – You can get rid of this suit. You're not getting rid of the ATA suit until the extraterritoriality question is – But two critical questions, Your Honor, points to make about this. One is, I mean, as this Court said in Sosa, the idea of the ATS is that not just that you violated a statute, but that you have violated some specific universal obligatory norm, so you are essentially an enemy of mankind. So as much as my clients would not like to be an ATA defendant, they would really, really, really not like to be labeled an enemy of mankind. There is a second – But let's talk about a claim like that, Mr. Clement. You know, there's a lot in this lawsuit, which I think you have plenty of things to gripe about in this lawsuit. I guess the question is, do you have something to gripe about as to this particular point, which is corporate versus individual liability? And so just – just assume a different lawsuit. So there's an American corporation. So the defendant is an American corporation, and it uses slave labor. And it uses slave labor of people in the United States. All the work is done in the United States. The activity is in the United States. Of a particular nationality. And – and the country from which these people come thinks that this is a pretty awful thing. And – and you're saying that there shouldn't be ATS liability against the corporation in that circumstance, even though they are using slave labor, clearly violating an international norm, even though in our domestic system, the manner of – the method of enforcement we usually use is corporate liability, and even though this is a case in which the other country thinks, who cares if it's a corporation? We want our people to be able to recover. Justice Kagan, of course that's a tough hypo. But the answer to the tough hypo is there's absolutely no obstacle to use the ATS to sue all of the individuals that took the action. And if you sue the individuals, you are certainly going to make us accountable to the foreign government. But not to have very much money. But – well, actually, people who work especially in management positions in corporations tend to have a fair amount of money. And so I think you are, in that scenario, and you're hypothetical, you're going to find plenty of deep-pocketed defendants. You're not going to have the mens rea requirement problems, which is why all of these corporate entities have been left out of the international criminal tribunals. And those same mens rea problems apply absolutely the same in an intentional tort like this. So you're going to – my humble point to you is, yeah, at first blush it might seem a little weird that the U.S. corporation is not a defendant. But there are plenty of other potential U.S. defendants that will avoid the diplomatic friction. And then the cost on the other side of allowing the foreign corporations to be sued, if you applied the same logic here, this suit wouldn't happen. If you actually limited this to the people who are actually liable under Article 5 of the Financing Convention, people in management or control positions, all of those people are in Jordan. So the corporate form here is the question presented. It's also integral to all of these problems. It's not an accident that it was used to question the court. Alito, in the slavery hypothetical, wouldn't that be a felony under Federal law? Wouldn't the individuals who were victimized have numerous other opportunities, numerous other ways to sue this American corporation for these torts? Absolutely, Justice Alito. But they would also do it. But the individuals don't care if it's a felony. They would like a little bit of compensation. Exactly. And that's why I did want to answer Justice Kagan. Even on the terms of the ATS, there would still be defendants here in America that could bring – that could be proper defendants in those actions. They would be U.S. citizens. I'm not – I don't think I'm going to get a chance to say, but there is a lot to the argument. I guess one of the things that I'm suggesting, Mr. Clement, and this is reflected in your brief. You spend a lot of time essentially saying this is one of those far-and-cubed cases that we dealt with in Kiobel. And that might be right. But the question of corporate versus individual liability is a question that's entirely orthogonal to that. I mean, that you can come up with a very, very domestic-looking suit that raises the question of corporate versus individual liability. And that that suit, when you focus on it, leads you to say, why on earth would you draw a distinction of this kind? Justice Kagan, that's a great word, but I don't think it describes the relationship between corporate liability and these extraterritorial suits. I don't think it's an accident that each time you get one of these foreign-cubed cases, that it's a foreign corporation. I don't think it's an accident that each time it comes up, it's really attractive to maybe duck the corporate liability question and decide the extraterritoriality question. First of all, thank goodness we don't really have a lot of U.S. corporations that are violating international law right here in America. But if they did, there'd be plenty of defendants under the ATS and under other provisions. So the real incidence of this, the real impact of corporate liability, is the ability to get a corporation like Arab Bank that's a cornerstone of the Jordanian economy, and you get them in here, you cause all sorts of diplomatic friction. And then as a bonus, you don't have to worry about whether the mens rea of somebody in Jordan and the mens rea of somebody who processed the transaction in the United States, whether any of those actually satisfied the requirements of the tort, because you can mush them all together and say it's corporate responsibility. That's why these are so attractive. That's why this issue has arisen. Ginsburg. There was some substantial sanction against this bank, wasn't there? There was. On the part of the U.S. Government. There was, which just shows that there's only a toehold of U.S. concern here, which is the dollar clearing transactions in the United States, and there is a far, far better way for the law to address that concern than with a 33-word jurisdictional statute passed in 1789. And that's really what this comes down to at the end of the day. I mean, obviously SOSA left the door ajar for some kinds of ATS cases, but with respect, I do not think SOSA left the door ajar for cases like this. Thank you. Thank you, counsel. Four minutes, Mr. Fisher. Thank you. I'd like to turn to questions three Justices have asked, starting with Justice Kennedy. Your question to me towards the end of my time about whether corporate liability falls on the conduct or enforcement side, and I'd like to make two additional points about that. First of all, in the Bromais case, which is cited in the Solicitor General's brief dealing with the Little Tucker Act a few years ago, free and clear of all of the extraterritoriality concerns and everything else, just this Court straightforwardly said, citing the provision there that said who could be sued, that that was part of the remedial structure of the Little Tucker Act. And we think that makes sense because that is at the heart of the notion of corporate personhood. What the Court has said time and again is that part of the corporate bargain is that you get privileges and opportunities, but you also have burdens of being held liable in tort actions. One additional thing on that I think is important to point you to the Antiterrorism Act. Mr. Clement is right that the Antiterrorism Act applies to U.S. citizens and not to aliens, but the reason why, and this is laid out in the amicus brief from former counterterrorism officials, is because Congress knew that aliens already had a cause of action under the ATS. And indeed, Congress made clear in the ATA that it was exercising its power under the Define and Punish Clause. And so the Congress understood to be codifying a cause of action for a violation of international law, and as my opponent even concedes, in one that swept in corporations. Mr. Chief Justice, you asked about accountability of the United States and the history of the alien tort statute. I just want to make sure the Court remembers that piracy is one of the quintessential concerns Congress had in mind. And that's a little bit different than simply another country taking us to war. That was the notion that certain conduct makes somebody an enemy of all mankind. And if you take that concern of piracy historically and compare it to terrorism today, we think the parallels are quite obvious. And even if we had to prove that this is a situation where some other country would be mad, imagine Israel's view if our financing, if our entire finance system could be used and accessed to commit terrorist attacks, make them easier, make them more deadly, make the funding more effective. Israel, if suits like this were taken away, Israel and countries like it might well have a complaint to the United States. And finally, Justice Gorsuch, I wanted to turn back to your question about the history and make two additional points. One is piracy, as Justice Sotomayor pointed out, I think also is a very difficult thing to account for under the theory you've described. Secondly, I would just bring you back to the ordinary. Why is that? Because pirates wouldn't be, they wouldn't be citizens of the United States. Right. But if we're not responsible for it, it wouldn't be the cause of a just war against us and therefore not a cause of concern under the ATS. No, but that brings me back to my other point. Oh, good. So it's the first one we can put aside. No, no, no. Piracy is something that doesn't exactly fall into the same rubric. But the second point is, I would just point you to the plain text of the act. And as we've pointed out quite clearly in our brief, Congress went out of its way to specify aliens as proper plaintiffs. As plaintiffs, yes. Yes, yes. But if Congress was so careful to do that, if it had wanted only U.S. nationals to be defendants, you have to ask the question why Congress wouldn't have been specific on the others. And the argument that I've been developing isn't mine. I can't take credit for it. But it's a very careful argument that has been developed that that is exactly what those words meant to the first Congress. No, but I think that, as the Court said in Amarada Hess, Congress did not limit the scope of defendants. And again, if you look at the rest of the Judiciary Act, other provisions we point out in our brief did limit the scope of proper defendants. So who was a proper plaintiff and who was a proper defendant in the jurisdictional provisions Congress was creating was very much at the center of Congress's mind. And so we think the plain text, if nothing else, answers the question. Right. But the plain text is the law of nations, and the argument, I'm not doing it justice, but it's briefly that a law of nations would have meant something that would have been attributable to the United States, and the only thing that would have been attributable to the United States is an act by a U.S. citizen. Well, on that level, we simply disagree with the concept of law of nations. As has been pointed out, law of nations deals with the conduct, not the enforcement. Thank you, counsel. The case is submitted.